Jose Manuel Hiraeta,

        Petitioner,

– against –

People of the State of New York,

        Respondent.

**MEMORANDUM & ORDER**

16-cv-00167 (ERK)

KORMAN, *J.*

   Jose Manuel Hiraeta was convicted, after a jury trial, of first-degree gang assault, first-degree assault, first-degree robbery (two counts), second-degree robbery, and fourth-degree criminal possession of a weapon. He was acquitted of a second count of criminal possession of a weapon. Hiraeta was sentenced to an aggregate prison term of ten years followed by five years of post-release supervision. The Appellate Division reversed Hiraeta's three robbery convictions and affirmed the remaining convictions. *People v. Hiraeta*, 986 N.Y.S.2d 217, 218 (App. Div. 2d Dept. 2014). The reversal did not affect the sentence. Hiraeta now seeks habeas corpus relief.

## BACKGROUND

   On November 13, 2007, at approximately 10 or 11 o'clock at night, Weiner Maldonado and his friend Miguel Ramos entered Queen Bee Laundromat in Flushing, Queens to do laundry. The laundromat is located in an area that MS-13—a predominately Salvadoran gang—has claimed as its territory. *Tr.* at 1029–30, 1037–41. Indeed, at the time, buildings in the area near the laundromat featured graffiti used by MS-13 members to mark their territory.

Later that night, Maldonado and Ramos went outside of the laundromat to call a taxi to pick them up. *Id.* at 886–87. As Ramos was trying to make the phone call, three men—one of whom had three vertical dots tattooed on his forehead—confronted Maldonado and Ramos and asked them where they were from and with which gang they were affiliated. *Id.* at 625–32, 888–89. Maldonado answered that he was from Guatemala and that they did not "belong to any gang." *Id.* at 629–30. The three men then told Maldonado and Ramos that the territory was controlled by "Mara Salvatrucha"—the full name for MS-13—and told them that they "could not step foot in that territory." *Id.* at 889, 1029–1030. Maldonado and Ramos then re-entered the laundromat and the three men left. *Id.* at 630, 889.

Approximately one minute later, Maldonado suggested that the pair go to the deli next-door and purchase drinks while they were waiting for the taxi. *Id.* at 889–90. Ramos agreed. *Id.* at 890. When the pair emerged from the deli, they found that a large group of people had surrounded the deli exit in a semi-circle. *Id.* at 631–32, 891–93. The three men who had initially confronted Maldonado and Ramos were among the group. *Id.* at 891–92. Maldonado would later testify that petitioner Jose Hiraeta was in this group, standing no more than three feet to the left of him, and that he had an unobstructed view of him. *Id.* at 633–37. Although there was no natural light when Maldonado and Ramos exited the deli, the surrounding area was well-lit by lights from the deli and laundromat, as well as from street lights. *Id.* at 619, 625–26, 630–31, 1011–1013.

As Maldonado and Ramos were surrounded, the man with the three vertical dots tattooed on his forehead told Maldonado and Ramos that the territory "belonged to the Mara Salvatrucha and that it was to be respected." *Id.* at 899. Maldonado then asked this man why they would not fight them one-on-one if there were any problems. *Id.* at 899–900. The man with the three-dot tattoo replied that they did not do that and that "if [Maldonado] wanted to fight one that he would

have to fight all of them" and that if one of them hit him they would all hit him. *Id.* at 644, 899–900. After this exchange Ramos suggested that they leave. Maldonado agreed and the pair began walking toward the laundromat. *Id.* at 900–01.

Then, as Maldonado and Ramos were walking back toward the laundromat, the group followed them, made gang hand-signs, and two to four of them, although not Hiraeta himself, brandished bicycle chains. *Id.* at 668, 901–06. Hiraeta then blocked Maldonado's path, so that he was face-to-face with Maldonado and no more than one-and-a-half feet away from him. *Id.* at 661–63. Hiraeta made gang hand-signs in Maldonado's face, and said that the members of the group "were from MS-13." *Id.* At this time, Maldonado noticed that Hiraeta had two blue horn tattoos, one on each side of his forehead, which were approximately two inches in length. *Id.* at 653–57.

Next, after Hiraeta blocked Maldonado's path, Maldonado was struck from behind with a chain by another member of the group. *Id.* at 664–65. The chain wrapped around his head and hit him in the forehead and mouth, bruising his forehead and shattering one of his front teeth. *Id.* at 485, 668–71. After Maldonado was struck with the chain, Hiraeta restrained Maldonado in a "bear hug" and the group then physically beat him knocked him to the ground. *Id.* at 671–74, 803–04. After he was knocked to the ground, the assailants, including Hiraeta, continued to beat him. *Id.* at 803–04. They kicked and punched him, struck him on the back with a chain, and used a plastic milk crate to bash his shoulders, legs, and feet. *Id.* at 672–74, 803–04.

After approximately three to five minutes of pummeling, Maldonado pushed the assailants off of him and ran away. *Id.* at 681–82, 803–04. Four men in the group chased Maldonado for approximately one block, but gave up the chase and Maldonado continued fleeing to a nearby 7-Eleven. *Id.* at 681–84. While at 7-Eleven, Maldonado examined his injuries and discovered that

his tooth was broken, his lips were "busted," and that he had "a lot of pain" in his body and forehead. *Id.*

## DISCUSSION

Hiraeta raises a number of issues in support of his petition. Each is without merit.

### (1) The Alleged *Miranda* Violation

On December 5, 2007, during post-arrest processing, Hiraeta told Detective Gramarossa that he was from El Salvador. Gramarossa, who was involved with the investigation of the beating of Maldonado, then asked Hiraeta if he had any nicknames and if he "was still hanging with MS-13." *Id.* at 1017–19. Hiraeta replied that his nickname used to be "Soldado" (a Spanish word that translates to "soldier") but that he now goes by "Bad Boy," and that he "just chills" with MS-13 members but is not a member. *Id.* at 1017–22. MS-13 is the abbreviation for a gang known as Mara Salvatrucha, which is slang for "Salvadoran Gang." *Id.* 1029–22.

This evidence was admitted at trial pursuant to the so-called pedigree exception to *Miranda's* prohibition on admission of post-arrest statements that were obtained without the requisite warnings. On appeal, the Appellate Division held that the statements were erroneously admitted. Nevertheless, it ruled that the error was harmless, because there was "overwhelming evidence" that Hiraeta participated in assaulting Maldonado and was affiliated with MS-13. *Hiraeta*, 986 N.Y.S.2d at 218–19.

This holding was clearly correct. The evidence at trial with respect to the issue of Hiraeta's membership in MS-13 included the following compelling evidence. First, Maldonado testified that, during the assault, Hiraeta explicitly stated that he and the other assailants were MS-13 members. Maldonado and Ramos also testified that Hiraeta's co-assailants claimed MS-13 membership. Second, Detective Gramarossa testified that he noticed that Hiraeta had blue "devil

4

horn" tattoos on his shaved head, and that he had never before seen devil horns tattooed on that part of the body. Tr. 1023. He later testified that he understood, based on his prior experiences in the gang unit, that blue is an MS-13 color, and that MS-13 members will often tattoo "devil horns," among other symbols, on their bodies. *Id.* at 1029–31. Third, photographs taken after Hiraeta's arrest that were admitted into evidence clearly display this tattoo on his shaved head. *Id.* at 660 (Ex. 7). Fourth, Maldonado also noticed Hiraeta's horn tattoos during the assault—and specifically noted that they were two inches in length.[1] In sum, this evidence rendered completely harmless the admission of the defendant's post-arrest statement that he "just chills" with MS-13, and used to go by the nickname "soldado." Certainly, it cannot be said that there was a reasonable probability that the erroneous admission of Hiraeta's post-arrest statement as pedigree information affected the verdict. *See Brecht v. Abramhamson*, 507 U.S. 619 (1993).

Also harmless was the trial court's refusal to instruct the jury to determine whether Hiraeta's statements constituted pedigree information and, if the jury found that the statements did not constitute pedigree information, to consider whether he made those statements to Detective Gramarossa voluntarily. Moreover, these arguments are without merit.

(2) Insufficiency of the Evidence Arguments

Hiraeta raises several claims regarding the sufficiency of the evidence. Under New York law, it is an element of both first-degree gang assault and first-degree assault that the victim suffered serious physical injury. N.Y. Penal Law §§ 120.07, 120.10(1). New York Penal Law § 10.00(10) defines "serious physical injury" as "physical injury which creates a substantial risk

---

[1] The horn tattoo was not visible to the jury at trial because Hiraeta had allowed his hair to grow, covering the tattoo, at the time of trial. Tr. 506. Under the circumstances, where the existence of the tattoo was relevant to the identification, Hiraeta's decision not to shave his head in order to show the jury that he was not the individual identified by Maldonado as having a distinctive devil horn tattoo is telling.

5

of death, or which causes death or serious and protracted disfigurement, protracted impairment of health or protracted loss or impairment of the function of any bodily organ."

A person is seriously disfigured within the meaning of the statute "when a reasonable observer would find her altered appearance distressing or objectionable." *People v. McKinnon*, 15 N.Y.3d 311, 315 (2010). The standard of whether a reasonable observer would find the victim's appearance distressing is objective, but the injury must be viewed in context including the location of the victim's injury. *Id.* The Appellate Division has recognized that the "prominent location" of an injury on a victim's face can be considered in the *McKinnon* analysis. *See People v. Reitz*, 3 N.Y.S.3d 228, 230 (App. Div. 4th Dep't 2015); *People v. Coote*, 972 N.Y.S.2d 263, 263 (App. Div. 1st Dep't 2013). Moreover, the loss of teeth can constitute serious and protracted disfigurement. *People v. Everett*, 973 N.Y.S.2d 207, 208 (App. Div. 1st Dep't 2013) (holding that loss of four front teeth constituted serious and protracted disfigurement); *People v. Snyder*, 953 N.Y.S.2d 430, 432 (App. Div. 4th Dep't 2012) (holding that victim's loss of three teeth and need for crowns to be implanted in another two teeth constituted serious and protracted disfigurement).

The prosecution submitted medical evidence which showed that Maldonado suffered facial lacerations, that his tooth was fractured in four places when he was struck in the mouth with a bicycle chain, and that the tooth had to be removed because it was too damaged to be restored. People's Ex. 11; SR 394. Moreover, Detective Maguire testified that he noticed that Maldonado had a laceration on the back of his right ear, bruises on his forehead and back, injuries on his left shoulder, and that Maldonado was missing a tooth. Tr. 485–91; People's Exs. 1–5. The prosecution also submitted five photographs of Maldonado's injuries taken by Detective Maguire only two days after the assault—one of which showed a gap in Maldonado's teeth. People's Ex. 1; SR 377.

Notwithstanding the holdings in *Everett* and *Snyder* that the loss of teeth can constitute serious and protracted disfigurement, some New York courts appear to require a more grievous injury to satisfy the *McKinnon* requirement that a reasonable observer would find the victim's appearance distressing or objectionable. *See People v. Rosado*, 930 N.Y.S.2d 10, 10 (App. Div. 1st Dep't 2011) (holding that evidence of a broken nose that had to be surgically repaired and three chipped teeth did not qualify as serious and protracted disfigurement). Nevertheless, passing over the significance of Maldonado's broken tooth, the evidence at trial also established that Maldonado was suffering from headaches two years after the assault. Under New York law pain itself may amount to protracted impairment of health. *People v. Stewart*, 18 N.Y.3d 831, 832–33 (2011). In addition, New York courts have also held that injuries that continued to cause the victim pain for over one year after the initial assault constituted protracted impairment of health. *People v. Messam*, 954 N.Y.S.2d 532, 533 (App. Div. 1st Dep't 2012) (holding that victim who had pain in her jaw two years after the assault had suffered protracted impairment of health); *People v. Lanier*, 843 N.Y.S.2d 629, 629 (App. Div. 1st Dep't 2007) (holding that the victim's pain from dental injuries that continued over one year after the assault constituted protracted impairment of health).

At trial, Maldonado testified that he began suffering from headaches after the assault and that he continued to experience headaches at the time that the trial began, which was two years, two months, and twenty-six days after the assault. Tr. 862–63, 1140. Maldonado's assertion that he experienced headaches after the assault was then corroborated by medical records which show that on December 6, 2007, Maldonado returned to the Ryan Nena Clinic complaining of pain in his forehead which he ranked between five and seven on a scale of one through ten. People's Ex. 11; SR 399.

Nor is there any merit to Hiraeta's claim that there was insufficient evidence that the chain employed during the assault was used as a dangerous instrument. Under New York law, a person is guilty of fourth-degree criminal possession of a weapon when "he possesses any . . . dangerous or deadly instrument or weapon with intent to use the same unlawfully against another." N.Y. Penal Law § 265.01(2). "Dangerous instrument" is defined as "any instrument . . . which, under the circumstances in which it is used . . . is readily capable of causing death or other serious physical injury." N.Y. Penal Law § 10.00(13). The instrument does not have to be inherently dangerous to qualify as a dangerous instrument, it only needs to be used in a manner that renders it readily capable of causing serious physical injury. *People v. Carter*, 53 N.Y.2d 113, 116–17 (1981); *People v. Warren*, 949 N.Y.S.2d 496, 498 (App. Div. 2d Dep't 2012).

There was sufficient evidence for a rational jury to conclude that the bicycle chain constituted a dangerous instrument because New York case law demonstrates that a bicycle chain used to beat another person qualifies as a dangerous instrument. *See People v. Richardson*, 564 N.Y.S.2d 71, 72 (App. Div. 1st Dep't 1990) (holding that a metal chain that defendant wrapped around his hand before punching victim in the face constituted a dangerous instrument). Indeed, in *People v. Vasquez*, the New York Court of Appeals held that a dense ball of paper towels wadded up with rubber bands constituted a dangerous instrument when the defendant shoved the ball of paper towels into the victim's mouth with sufficient force to break one of the victim's teeth. 88 N.Y.2d 561, 580 (1996). Here, the prosecution presented evidence, including witness testimony and photographs of Maldonado's injuries, which demonstrated that, as a result of being beaten with the chain, Maldonado suffered not only a broken tooth, but also bruising to his forehead and marks on his back. People's Exs. 1–5; Tr. 485, 670–74. These injuries are more serious than those

suffered by the victim in *Vasquez*, and the bicycle chain was more dangerous than the weapon used in that case.

Hiraeta's related claim that there was insufficient evidence of his intent to cause Maldonado serious physical injury, or to use the chain as a dangerous instrument, is also without merit. Under New York law, a defendant is criminally liable for the acts of another person when the defendant acts with the mental culpability required for the commission of the crime and either "solicits, requests, commands, importunes, or intentionally aids" the person in the commission of the crime. N.Y. Penal Law § 20.00. The level of participation required for a jury to infer that a defendant shared his accomplices' criminal intent, and to find him guilty under a concert of action theory, is not substantial.

Thus, in *In re Justice G.*, the defendant was a member of a group of individuals who surrounded the two victims, forced them against a fence, and robbed them. 22 A.D.3d 368, 369 (N.Y. App. Div. 1st Dep't 2005). During the robbery the defendant "remained in very close proximity, showing approval by smiling, while others in the group took money from both victims and punched one victim in the face." *Id.* The defendant then fled, along with the group, including one person carrying the stolen property. *Id.* Even though the defendant apparently never made contact with the victims or the stolen property, the Appellate Division held that his conduct was sufficient to establish shared criminal intent. *Id.* Moreover, assault under a concert of action theory does not require that the defendant deal the blow that causes serious physical injury to the victim. *People v. Baugh*, 956 N.Y.S.2d 313, 316 (App. Div. 3d Dep't 2012).

Here, the prosecution presented sufficient evidence for a rational jury to conclude that Hiraeta shared the other assailants' intent to cause Maldonado serious physical injury and to use the chain as a dangerous instrument as required to support Hiraeta's first-degree gang assault, first-

degree assault, and fourth-degree criminal possession of a weapon convictions. N.Y. Penal Law §§ 120.07, 120.10(1), 265.01. At trial, Maldonado testified that when he tried to walk back to the laundromat Hiraeta blocked his path, made gang hand-signs in his face, and then restrained him in a "bear hug" while the other assailants struck him on the back with the chain and beat him. Tr. 661–63, 672–74. Maldonado also testified that Hiraeta hit and kicked him after he was knocked to the ground. *Id.* at 672–74, 804. Hiraeta was not a mere passive, albeit approving, observer as was the defendant in *In re Justice G.*. Instead, he actively participated in the assault. *Compare In re Justice G.*, 22 A.D.3d at 369, *with* Tr. 672–74.

Also without merit is Hiraeta's related claim that the trial judge's jury instruction on accessorial liability was "confusing." Habeas Pet. 16. At trial, the judge instructed the jury that "if it is proven beyond a reasonable doubt that the defendant is criminally liable for the conduct of another, the extent or degree of the defendant's participation in the crime does not matter." Habeas Pet. 16; Tr. 1265. The trial judge then continued by instructing the jury that "[a] defendant proven beyond a reasonable doubt to be criminally liable for the conduct of another in the commission of a crime is as guilty of the crime as if the defendant personally had committed every act constituting the crime." Tr. 1265–66. Passing over the issue of whether Hiraeta's claim is procedurally defaulted, the jury instruction was correct.

Although Hiraeta claims that the instruction could have led the jury to believe that having a small role in the commission of the crime is not a defense, this is irrelevant because it is not a defense for a defendant to claim that he only had a small role in the crime. Under New York law, to support a conviction under a concert of action theory the prosecution only has to prove that the defendant acted with the mental culpability required for the commission of the offense and solicited, requested, commanded, importuned, or intentionally aided the other criminal actor in

10

committing the crime. N.Y. Penal Law § 20.00; *People v. Rivera*, 84 N.Y.2d 766, 771 (1995). Significantly, the unchallenged portions of the trial judge's jury instruction on accessorial liability echoed the New York accessorial liability statute and the New York Criminal Jury Instructions word for word. N.Y. Penal Law § 20.00; CJI2d[NY] Accessorial Liability, *available at* http://www.nycourts.gov/judges/cji/1-General/CJI2d.Accessorial_Liability.Rev.pdf; Tr. 1264-66.

### (3) The Alleged Prosecutorial Misconduct

Finally, Hiraeta claims that the prosecutor committed misconduct during summation by stating that Maldonado would "never forget" Hiraeta's face and the assault, and by referencing Hiraeta's tattoos, nicknames, gang affiliation, and haircut. Habeas Pet. 18–19; Tr. 1194–95, 1232–37. Nevertheless, the claim is without merit for the reasons stated in the opinion of the Appellate Division. *See People v. Hiraeta*, 986 N.Y.S.2d 217, 200 (App. Div. 2d Dep't 2014). I add these brief words. The challenged portion of the summation goes to the validity of the eyewitness identification. I have previously detailed the overwhelming evidence in that regard, and consequently, any impropriety in the summation pertaining to that issue was harmless. For example, the prosecutor's statement that Hiraeta allowed his hair to grow longer to cover his tattoos and confuse Maldonado was well supported by the evidence. Tr. 1236. At trial, Detective Maguire testified that when Hiraeta was arrested on December 5, 2007, not long after Maldonado's assault on November 14, 2007, Hiraeta had "very short" hair, but that it had grown longer since the arrest. *Id.* at 501–06. Moreover, the prosecution adduced arrest photographs taken of Hiraeta during his arrest on December 5, 2007 in which Hiraeta's hair is short and his horn tattoos are still clearly visible. People's Exhibit 7; Tr. 502–504, 660. Indeed, Detective Maguire's testimony that Hiraeta's hair had grown longer since the arrest was corroborated by Maldonado's testimony. In his testimony, Maldonado stated that when he was assaulted Hiraeta's hair was approximately the

11

same length as it was in Hiraeta's December 5 arrest photograph, and that Hiraeta's hair was shorter when he was assaulted than it was at trial. Tr. 657–660.

### (4) Hiraeta's Claim That The Sentence Was Excessively Harsh

Hiraeta's argument that the sentence given to him was excessively harsh is also without merit. Hiraeta was convicted of participating in a violent attack on Maldonado with nine to fifteen other men and three women. During the attack, a bicycle chain was used as a weapon, Maldonado's tooth was shattered, he suffered facial lacerations and injuries all over his body, and he experienced headaches over two years after the assault. Tr. 484–85, 669–71, 862–63, 1140; SR 394. Under these circumstances, the sentence of ten years imprisonment, which is less than half of the maximum sentence of twenty-five years, was not excessive. N.Y. Penal Law §§ 70.00(2)(b), 120.07, 120.10.

## CONCLUSION

The petition for a writ of habeas corpus is denied.[2] I also decline to issue a certification of appealability. **SO ORDERED.**

Brooklyn, New York
June 13, 2017

*Edward R. Korman*
Edward R. Korman
United States District Judge

---

[2] Because Hiraeta's claims are without merit, I have addressed them without invoking AEDPA deference, which would have been otherwise appropriate.